```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
DEUTSCHE BANK SECURITIES, INC.,         :
                                        :
                        Plaintiff,      :   18cv10191(DLC)
            -v-                         :
                                        :   MEMORANDUM OPINION
MARIA DE LOS ANGELES BORJAS and         :        & ORDER
BRALISOL ASSOCIATES LTD.,               :
                                        :
                        Defendants.     :
                                        :
----------------------------------------X
```

APPEARANCES

For the plaintiff:
David G. Januszewski
Sesi V. Garimella
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005

For the defendants:
Jenice L. Malecki
Malecki Law
11 Broadway, Suite 715
New York, New York 10004

DENISE COTE, District Judge:

On July 27, 2018, Deutsche Bank Trust Company Americas ("DBTCA") filed an action to recover a deficit of approximately $2 million from Rado Limited Partnership ("Rado"), an accountholder that is related to the defendants in this action, Maria De Los Angeles Aparain Borjas ("Borjas") and Bralisol Associates Ltd. ("Bralisol"). In response, on August 7, the defendants began a Financial Industry Regulatory Authority

("FINRA") arbitration against plaintiff Deutsche Bank Securities, Inc. ("DBSI"), which, unlike DBTCA, is a FINRA member. DBSI now moves for a preliminary injunction to enjoin the FINRA arbitration. For the following reasons, the motion is granted.

**Background**

The following facts are taken from the parties' submissions. Defendants held investment accounts with nonparty Insight Securities, Inc. ("Insight"), a broker-dealer located in Illinois. The defendants' Insight account was managed by nonparty Fernando Haberer, who is related by marriage to the defendants and acted as the defendants' investment advisor.

The defendants contend that in March 2018 Haberer used forged letters of authorization ("LOAs") to liquidate funds and securities from the defendants' Insight account without the defendants' authorization. The funds taken from the Insight account were deposited in an account for Rado Limited Partnership ("Rado") that is managed not by DBSI but by DBTCA. Haberer also had authority over Rado's account with DBTCA. The Rado accountholders and the defendants are connected to each other and to Haberer through marriage.[1]

---

[1] Borjas is the partner of Roberto Teofilo Levi ("RT Levi"). RT Levi is the brother of Ricardo Jaime Levi ("RJ Levi"). RJ Levi

The defendants contend that Haberer conspired with Reynaldo Figueredo, an employee of both DBSI and DBTCA, to move the funds from their Insight account. Figueredo is licensed by FINRA. A FINRA BrokerCheck indicates that DBTCA and DBSI are "under common control." As noted above, DBSI is a FINRA member, but DBTCA is not.

As further evidence of the association of Haberer and Figueredo, the defendants present evidence regarding Biscayne Capital International LLC ("Biscayne"). The defendants submitted three email chains from 2016 between Biscayne employees on which both Figueredo and Haberer are apparently copied. No email directly to or from Haberer in connection with Biscayne has been submitted.

In addition, the defendants contend that the funds taken from their Insight account were routed through accounts in their name at an entity known as Madison Assets, LLC ("Madison"). They have not submitted account statements from Madison bearing their names, or other records to show their connection to any Madison account. The defendants further contend that Madison

---

owns Bralisol with his ex-wife and four daughters. One of RJ Levi's daughters is married to Diego Alejandro Saul Romay ("Romay"). Rado is owned by the Diego Trust, a trust created by Romay's parents for the benefit of Romay, his wife, and his three children. One of Romay's siblings is Mirta Romay, whose daughter is married to Haberer's brother.

3

holds an account at a Deutsche Bank entity.² They submit a margin activity statement from Deutsche Bank that indicates that Deutsche Bank played a "custody and clearing" role in a transaction for Madison.³

On July 27, 2018, DBTCA filed a complaint against Rado seeking approximately $2 million from Rado to cover a deficit in Rado's account with DBTCA. See Deutsche Bank Trust Co. Ams. v. Rado L.P., No. 18cv6768(DLC) (S.D.N.Y. filed July 27, 2018) (the "Rado Action"). Rado has filed a counterclaim, alleging that DBTCA is liable to Rado for approximately $8.5 million for allowing Haberer to conduct fraudulent trades in Rado's account.

On August 7, defendants filed a statement of claim with FINRA against DBSI, Insight, and parties related to Insight. An amended statement of claim was filed on October 11.

At a conference held in the Rado Action on October 26, counsel for DBTCA indicated that it planned to file an action on behalf of DBSI to enjoin the FINRA arbitration. An Order of October 29 set a schedule for the motion.

---

² The precise identity of this Deutsche Bank entity -- whether it is DBSI, DBTCA, or another corporate entity -- is not disclosed in the defendants' brief or evidentiary submissions.

³ The defendants have also submitted a bankruptcy court petition filed in this district seeking recognition of the liquidation of Madison in the Cayman Islands. This petition includes the allegation that Madison "until recently had, and may still have, cash and securities in accounts in its name in several banks in the United States, including Deutsche Bank in New York."

4

On November 2, DBSI filed the complaint in this action, seeking a preliminary and permanent injunction against the FINRA arbitration, and a motion for a preliminary injunction. Defendants, represented by the same counsel as the defendants in the Rado Action, were served with the relevant papers on November 5 and 6, and filed papers opposing the preliminary injunction on November 12. The motion became fully submitted on November 16.

## Discussion

"A preliminary injunction is an equitable remedy and an act of discretion by the court." ACLU v. Clapper, 804 F.3d 617, 622 (2d Cir. 2015). "A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (citation omitted).

The crux of the parties' dispute on this motion is whether DBSI has shown a likelihood of success on the merits. It is

5

well settled that a party forced to arbitrate a dispute that is not arbitrable is "irreparably harmed by being forced to expend time and resources" on an unenforceable arbitration to which it has not consented. Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (citation omitted). For similar reasons, the public interest and equities favor enjoining an arbitration that is outside the scope of an arbitration agreement.

"In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011). Where arbitration is demanded pursuant to the rules of a self-regulatory organization such as FINRA, such rules are "interpreted like contract terms . . . to give effect to the parties' intent as expressed by the plain language of the provision." Citigroup Glob. Markets Inc. v. Abbar, 761 F.3d 268, 274 (2d Cir. 2014) ("Abbar") (citation omitted).

Defendants contend that arbitration is required by FINRA Rule 12200 ("Rule 12200"), which provides in relevant part that parties "must arbitrate" if:

- Arbitration under the Code is either:
(1) Required by a written agreement, or

6

>     (2) Requested by the customer;
>
> • The dispute is between a customer and a member or associated person of a member; and
>
> • The dispute arises in connection with the business activities of the member or the associated person
> . . . .

FINRA Rule 12200, http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=4106. FINRA defines a member in relevant part as "any broker or dealer admitted to membership in FINRA." FINRA Rule 12100(q), http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4099 ("Rule 12100"). An "associated person of a member" is defined via Rule 12100(b) and 12100(u) as "[a] natural person who is registered or has applied for registration under the Rules of FINRA." Rule 12100(u).

FINRA defines "customer" as follows: "A customer shall not include a broker or dealer." Rule 12100(k). The Second Circuit has held that "a 'customer' under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." Abbar, 761 F.3d at 275.

Because there is no written agreement between DBSI and the defendants, arbitration may only be required if the defendants are "customers" of DBSI. DBSI has shown a likelihood of success in demonstrating that the defendants are not its customers.

7

The defendants' theory of the customer relationship appears to be as follows. First, Haberer forged LOAs that allowed him to liquidate funds from the defendants' account with Insight. Second, Haberer redirected those funds into Rado's account with DBTCA instead of Deutsche Bank accounts belonging to the defendants.[4] Third, DBTCA collected a fee for the transaction. Fourth, Figueredo is listed as primary officer on a March 2018 statement for the Rado DBTCA account. Fifth, Figueredo is registered with FINRA as an associated person of both DBTCA and DBSI. Under the defendants' theory, this five-step connection is sufficient to make them customers of DBSI.

There are several problems with this theory. First, there is no dispute between the defendants and DBSI that is connected to any account the defendants have at DBSI. The dispute arises out of what Haberer did with funds transferred out of the defendants' Insight account held at an Illinois broker-dealer unaffiliated with DBSI.

The defendants do not contend that Haberer is associated with DBSI, which is admittedly a FINRA member. Nor do they contend that their Insight account was held at or managed by DBSI.

The defendants also contend that they are customers of DBSI

---

[4] The defendants' brief uses "Deutsche Bank" to refer generally to DBSI and DBTCA.

8

and that this dispute arises out of that relationship by virtue of the account held by Madison. These arguments are also unavailing. The defendants have not submitted any reliable evidence that they are the Madison account holders, that Madison held an account at DBSI, or that the improperly transferred funds moved through any account held by Madison at DBSI.

Second, there is no evidence that the defendants are customers of DBSI because they purchased a good or service from DBSI or any person associated with DBSI, included Figueredo. The defendants suggest that fees charged by DBTCA on the Rado account in April 2018, one month after the illicit transfer, constitute a purchase of a service. But, even assuming that DBTCA and DBSI are sufficiently connected such that actions of DBTCA could require DBSI to arbitrate, the fact that DBTCA collected a fee from funds in Rado's account does not transform the defendants into DBTCA's customer. A fee paid out of a Rado account is a payment by Rado not the defendants.

Third, the defendants repeatedly insinuate that they have a dispute with Figueredo, who is associated with DBSI, because Haberer and Figueredo conspired together to direct the Insight account funds to the Rado DBTCA account. The defendants' evidentiary submissions -- emails from 2016 on which both Figueredo and Haberer are copied -- do not support a finding that Figueredo worked with Haberer to improperly divert the

defendants' Insight account funds in 2018 to DBTCA.

In sum, the defendants' allegations and evidentiary submissions support a theory that Haberer improperly transferred funds from their Insight accounts in Illinois into Rado's account with DBTCA, not DBSI. DBSI has shown a likelihood to prevail in proving that the defendants were not its customers within the meaning of Rule 12200 in connection with that transfer.

## **Conclusion**

The November 2, 2018 motion to preliminarily enjoin the FINRA arbitration against DBSI initiated by the defendants on August 7, 2018, is granted. This action is otherwise stayed pending the completion of proceedings in 18cv6768.

SO ORDERED

Dated: New York, New York
November 28, 2018

_____
DENISE COTE
United States District Judge

10